Aldo Fernando **KAHAN NOVOA** and Gustavo Kahan Novoa, Plaintiffs,

v.

**SAFRA NATIONAL BANK OF NEW YORK, Defendant.**

Nos. 02–23377–CIV, 02–23377–CIV.

United States District Court, S.D. Florida.

Aug. 19, 2003.

Jeffrey M. Herman and Stuart S. Mermelstein, of Herman & Mermelstein, P.A., Hollywood, FL, for Plaintiffs.

Roger S. Kobert and Alexander E. Eagleton of Shutts & Bowen LLP, Miami, FL, for Defendant, Safra National Bank of New York.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HUCK, District Judge.

THIS CAUSE is before the Court on the Defendant, SAFRA NATIONAL BANK OF NEW YORK's Motion for Summary Final Judgment [DE # 44], filed May 5, 2003. Plaintiffs, ALDO FERNANDO KAHAN NOVOA and GUSTAVO KAHAN NOVOA, both Peruvian nationals, bring this action against Defendant Safra alleging negligence, breach of fiduciary duty, negligent misrepresentation, and violation of two Florida securities law statutes, for its conduct in connection with a failed investment in a Peruvian company. The Court has reviewed the Motion, Response, Reply, Local Rule 7.5 Statements of Facts, and supplemental memoranda, and is otherwise duly advised in the premises. For the reasons set forth below, Defendant's Motion for Summary Judgment will be GRANTED.

## I. BACKGROUND

### A. General Background

Plaintiffs, Aldo and Gustavo Kahan, are natives, citizens, and residents of Peru. Defendant, Safra National Bank of New York ("Safra"), is a national banking association headquartered in New York, New York. It maintains a branch office for private banking in Miami, Florida. In mid-August 2000, Plaintiffs met with representatives from Banco Nuevo Mundo ("BNM"), a Peruvian bank with which they had an established banking relationship, and ultimately decided to invest funds in promissory notes issued by Nuevo Mundo Holdings ("NMH"), an affiliate of BNM (the "Promissory Notes"). These Promissory Notes were short-term (three- or six-month term) and offered a rate of interest in excessive of 9%, which is well above the market interest rate.

### B. Plaintiffs' Custody Account with Safra

To facilitate this investment, the BNM representatives provided Plaintiffs with various account-opening documents with Safra logos on them and assisted Plaintiffs in filling out those documents. Pursuant to a prior agreement between Safra and BNM, Safra provides these documents to BNM to allow investors interested in investing in the Promissory Notes to open a custodial account with Safra.

Among the account-opening documents, signed by Plaintiffs on August 18, 2000, were a "Custody Account Agreement" and an "International Account Application." In the International Account Application, Plaintiffs agreed to abide by the International Banking Terms and Conditions for Accounts provided therewith. Plaintiffs also signed a letter authorizing Safra to procure promissory notes of BNM, or its affiliate NMH, on Plaintiffs' behalf and at

their sole risk.[1] After these documents were filled out, Plaintiffs reviewed and signed them. BNM then faxed and mailed the documents to Safra along with a letter of recommendation/introduction vouching for Plaintiffs' reputation and legitimacy. Upon receipt and review of the documents, Safra opened an international custody account in Plaintiffs' names.

### C. *Plaintiffs' Investments in the Promissory Notes*

With their custody account in place, instead of investing directly in the Promissory Notes, Plaintiffs transferred funds into their account at Safra then executed a letter instructing Safra to use that money to purchase the Promissory Notes on Plaintiffs' behalf and at Plaintiffs' sole risk. On three separate occasions, Plaintiffs wired funds into their custody account at Safra and then executed a letter (written in Plaintiffs' native language, Spanish) instructing Safra to purchase "for my account and risk" a Promissory Note with funds from the custody account. Thereafter, Safra, as custodian, purchased the Promissory Note per Plaintiffs' instructions. The first such transaction occurred on August 18, 2000, and involved $100,000. The second transaction occurred on August 23, 2000, and involved $230,800. The third transaction occurred on October 26, 2000, and involved $260,000.

### D. *NMH's Default on the Promissory Notes and Plaintiff's Lawsuits*

In December 2000, shortly after the November 2000 collapse of the Fujimori regime in Peru, BNM was "intervened" (i.e.,

seized) by Peruvian regulators. As a result, its affiliate, NMH, defaulted on its payment obligation under the Promissory Notes. Thereafter, civil enforcement proceedings were initiated in Peruvian court by or on behalf of a "syndicate" of private Peruvian citizens, including Plaintiffs, who lost money due to BNM's failure. That matter is still pending. On November 21, 2002, Plaintiffs commenced the instant action against Safra seeking to hold Safra liable to Plaintiffs for the losses that they incurred as a result of NMH's default on the Promissory Notes.

### II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.* On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen*, 121 F.3d at 646.

---

**1.** The substance of the account-opening documents will be discussed, *infra*, in the Discus-

sion Section of this Order.

While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough. *Id.; see also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

## III. DISCUSSION

 The Plaintiffs' case is premised on their contention that Safra constitutes a seller, either directly or indirectly, of the Promissory Notes to Plaintiffs. In Counts I (Negligence) and II (Breach of Fiduciary Duty), Plaintiffs allege that Safra breached certain duties which a seller of securities owes to buyers of securities, for example: the duty to exercise reasonable care in the solicitation and sale of the Promissory Notes, and the duty to give reasonable advice. In Count III (common law negligent misrepresentation) and Count IV (statutory negligent misrepresentation pursuant to Fla. Stat. § 517.301), Plaintiffs seek to hold Safra vicariously liable for misrepresentations that BNM representatives allegedly made to Plaintiffs in their capacity as sales agents of Safra. As to Counts IV and V, Plaintiffs allege violations of Florida securities laws.

In seeking final summary judgment, Safra argues, as a matter of law, it cannot be held liable to Plaintiffs as a seller of the Promissory Notes. As a preliminary matter, Safra contends that, through the various documents signed by Plaintiffs in August and October 2000, including the account-opening documents and the three letters of instruction, Plaintiffs: (1) acknowledged that the extent of Safra's role in their investment was limited to that of a custodian and intermediary between Plaintiffs, as buyers and NMH, the seller; and (2) expressly released and indemnified Safra from liability for those kind of acts alleged in the amended complaint. As such, Safra contends that it is entitled to summary judgment in its favor as to all counts in the amended complaint.

### A. Counts I and II (The Duty Issue)

In Count I, entitled "Negligence," Plaintiffs alleges that Safra owed them the following duties: (a) a duty to exercise reasonable care in the solicitation and sale of the Promissory Notes (Am. Compl. at ¶ 34); (b) a duty to adhere to fair and reasonable sales practices through its sales agents (the BNM representatives) (*Id.*); (c) a duty to develop reasonable grounds to believe that the investment in the Promissory Notes were suitable for Plaintiffs (*Id.*); (d) a duty to disclose to customers (i.e., Plaintiffs) negative information on BNM's financial condition and solvency which Safra knew or should have known (*Id.* at ¶ 35); (e) a duty to conduct an appropriate review of BNM before entering into its arrangement with BNM (*Id.* at ¶ 36); and (f) a duty to exercise reasonable measures to have BNM comply with all applicable United States banking regulations and requirements (*Id.*).

In Count II, entitled "Breach of Fiduciary," Plaintiffs allege that, by virtue of a fiduciary relationship created through the use an account at Safra to purchase the Promissory Notes, Safra had a duty to deal with clients (i.e., Plaintiffs) in good faith and owned them a fiduciary duty of loyalty and care. (*Id.* at ¶ 41.) According

to Plaintiffs, this fiduciary relationship, "in equity and good conscience ... bound [Safra] to act in good faith and with due regard to the interests of Plaintiff with regard to the BNM Notes." (*Id.* at ¶ 42.) Pursuant to this relationship, Plaintiffs contend that Safra owed Plaintiffs the following duties: (a) the duty act on behalf of Plaintiffs and give them reasonable advice (*Id.* at ¶ 43); (b) a duty to act in accordance with Plaintiffs' financial circumstances, and needs (*Id.*); (c) a duty to disclose material information regarding the investment in BNM Notes and the risks associated therewith (*Id.* at ¶ 44); (d) a continuing duty to disclose information material to investors in Promissory Notes (*Id.* at ¶ 45); (e) a duty to disclose negative information that Safra knew or should have known regarding the financial solvency of BNM (*Id.*); (f) a duty to provide Plaintiffs with reasonable advise regarding the sale or retention of their interests in the Promissory Notes (*Id.*); (g) a duty to refrain from self interested conduct (*Id.* at ¶ 46); and (h) a duty not to place its own interests ahead of Plaintiffs' interests with respect to the Promissory Notes (*Id.*).

These alleged duties placed upon Safra are premised on the presumption that Safra was the seller of the Promissory Notes, rendering investment advice with regard to the Promissory Notes, rather than merely an intermediary. This presumption is simply not supported by the record before this Court.

For example, the Custody Account Agreement, which was signed by Plaintiffs on August 18, 2000, it states, in pertinent part, at Page 1, Section 6, entitled "Investment Decisions":

> I understand and agree that all financial instruments and securities purchased by the Bank [Safra] for my Custody Account will *be selected by me without recommendation or advice by the Bank* and that *I alone bear any risk of loss in connection with any financial instruments or securities purchased or sold at my direction* for my Custody Account. I further represent and agree that I know and understand that *certain transactions* I may request the Bank to enter on my behalf *carry a high degree of risk and volatility* and I hereby declare that I am or will be familiar with the speculative nature of any such transaction.

(Exh. A to Def.'s Statement of Facts, Bates pages SNB 0430–0432) (emphasis added).

Further, in the International Account Application, also signed by Plaintiffs on August 18, 2000, they agreed to abide by the International Banking Terms and conditions for Accounts provided therewith. (*Id.* at Bates pages SNB 0427.) The International Banking Terms and Conditions for Accounts states, in pertinent part, at Page 2, Section 7, entitled "Bank's Liability," that:

> We [Safra] shall not be liable to you [Plaintiffs] for *incidental, consequential or indirect damages, nor shall we be liable for any failure, omission, delay, interruption or error in the performances of any duty arising under these Terms and Conditions, or otherwise due to ... insolvency or ordinary negligence of other banks or causes beyond our control.*

(*Id.* at Bates pages BS0000018–25) (emphasis added).

The International Banking Terms and Conditions for Accounts further provides, in pertinent part, at Page 4, Section 13, entitled "Bank's Indemnity (Security Against Loss)":

If the Bank [Safra] believes, in its sole discretion, that any instruction which it agrees to accept might expose it to claim, suits, losses, expenses, liabilities or damages, whether directly or indirectly, it may require security against loss satisfactory to it from you before following any such instructions, including, but not limited to an agreement to indemnify and hold harmless the Bank from and against any such claims, suits, losses, expenses, liabilities or damages.

Pursuant to this provision, Plaintiffs signed a letter in which they authorized Safra to procure the Promissory Notes, on this behalf and at his sole risk, for their account (the "Authorization Letter"). (Def.'s Statement of Facts at ¶ 9(G), Exh. C.) In the Authorization Letter, Plaintiffs expressly agreed to reimburse, indemnify, and hold Safra harmless from all liability, including attorney's fees, arising out of their investment in the Promissory Notes, including BNM's and NMH's failure to repay the Promissory Notes. *Id.*[2]

The Court finds that these documents, by there express terms, and other evidence in the record, undeniably indicate that Safra's role in the transaction between Plaintiffs and BNM/NMH was that of an intermediary, facilitating the transaction between seller BNM/NMH and buyer Plaintiffs and that any potential liability arising from Plaintiffs' investments in the Promissory Notes has been expressly waived. By signing the Custody Account Agreement, Plaintiffs expressly acknowledged that Safra owes them no duty to, and did not, give advice or make recommendations concerning the Promissory Notes. Under the International Banking Terms, Plaintiffs absolve Safra from any liability resulting from the "insolvency or ordinary negligence of other banks." Further, in the Authorization Letter, Plaintiff expressly agree to release and indemnify Safra from liability arising out of their investment in the Promissory Notes.

In addition to the above-mentioned documents, prior to each investment in the Promissory Notes, Plaintiffs executed a letter (written in Plaintiffs' native language, Spanish) instructing Safra to purchase "for my account and risk" a Promissory Note with funds from the custody account. It is undisputed that Safra received these letters and complied with

---

**2.** Two points bear mentioning at this point. The first involves choice of law. The Promissory Notes and this letter both indicate that they shall be governed in accordance with Florida law; on the other hand, the Safra's Custody Account Agreement states that "Custody Accounts administered at Safra National Bank of New York (including IBF) shall be subject to the substantive law of New York ..." Because there does not appear to be any conflict between the Florida law and New York law with respect to the issues addressed in this Order, both Florida law and New York law will be cited when necessary.

The second point involves the facts that the account-opening documents are in English and Plaintiffs' primary language is Spanish. While this issue was not contested by Plaintiffs in response to Safra's motion, the Court notes that, as a matter of law, Plaintiffs may bind themselves to English language documents by signing them, notwithstanding that Spanish is their native language. *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton,* 467 So.2d 311, 313 (Fla. 5th DCA 1985) (non-English speakers, just like English speakers, are free to bind themselves to English contract terms they sign without reading); *Leonard v. Garantia Banking, Ltd.,* No. 98 CIV. 4848(LMM), 1999 WL 944802, at *7 (S.D.N.Y. 1999), *aff'd* 213 F.3d 626 (2d Cir.2000) (in a securities fraud action, Portuguese speaker, who signed an English account agreement, was bound by its terms); *Paper Express, Ltd. v. Pfankuch Maschinen,* 972 F.2d 753, 757 (7th Cir.1992) (in our global economy, one is bound by terms of a document he signs in a language foreign to him).

Plaintiffs directions. This further demonstrates that Safra was not acting as a seller, but rather was acting as a custodian, dutifully following Plaintiffs instructions. The only duties that Safra owed to Plaintiffs relate to the administration of Plaintiffs' custody account. These duties include safekeeping Plaintiffs account and following Plaintiffs instructions. Plaintiffs do not dispute that Safra maintained their account pursuant to the terms of the Custody Agreement, nor do they dispute that Safra followed all instruction given it. Therefore, the Court will enter summary judgment in favor of Safra on Counts I and II of Plaintiffs' amended complaint.

## B. *Counts III and IV (The Agency Issue)*

■ According to allegations in Plaintiffs' amended complaint, representatives of BNM (the agents), on behalf of Safra (the principal), solicited investors in Peru to purchase the Promissory Notes by making material misrepresentation about the risk involved in the security. Counts III and IV of the amended complaint seek to hold Safra vicariously liable for these alleged misrepresentations that BNM representative made while convincing Plaintiffs to invest in the Promissory Notes. According to Plaintiffs, summary judgment is not appropriate as to these counts because there is a dispute of facts as to whether the BNM representatives were acting as agents of Safra when they made the alleged misrepresentations to Plaintiffs.

■ In order to find that an agency relationship exists, this Court must find either actual agency or apparent agency. In order for actual agency to exist: (1) the purported principal (i.e., Safra) must acknowledge that the agent (i.e., the BNM representatives) will act for it; (2) the

agent must accept the undertaking; and (3) the principal must have control over the agent's actions. *Goldschmidt v. Holman,* 571 So.2d 422, 425 n. 5 (Fla.1990); *Robbins v. Hess,* 659 So.2d 424, 427 (Fla. 1st DCA 1995); *Brilliant v. Raidy,* 189 Misc. 561, 563, 70 N.Y.S.2d 126 (1947).

The record before this Court on summary judgment indicates that the relationship between Safra and BNM was a business relationship, whereby Safra provided documents to BNM to facilitate the opening of a custody account a Safra for investors interested in investing in BNM/NMH Promissory Notes. There is no indication in the record that the transaction would be any different if Plaintiffs channeled their investment through another custodian or simple invested directly with BNM/NMH. As to the first element of the actual agency test, there is no evidence that Safra indicated to Plaintiffs or anyone else that BNM would act on its behalf. In fact, it is undisputed that Safra did not communicated anything to Plaintiffs as Plaintiff has never spoken to anyone at Safra. Without an acknowledgment from Safra that BNM may act on its behalf, there cannot be an acceptance on the part of BNM; accordingly, the second element also fails. In addition, there is no indication that Safra had any control over BNM's actions. To the contrary, it was BNM who had the control as it had the option of referring its investors to open accounts with Safra or another bank.

■ As for apparent agency, a plaintiff must show that: (1) the principal held out the agent as possessing sufficient authority to embrace the particular act at issue, or permitted the agent to have such authority; (2) the plaintiff had reason to believe that the agent had the authority he assumed to exercise; and (3) the plaintiff

relied thereon in good faith. *HSA, Inc. v. Harris–in–Hollywood, Inc.*, 285 So.2d 690, 693–94 (Fla. 4th DCA 1973); *Bruckner v. Hartford Acc. & Indem. Co.*, 239 A.D.2d 806, 657 N.Y.S.2d 514, 515 (3d Dep't 1997). As evidence that Safra held out the BNM representatives as its agents, Plaintiffs point to Safra's blank account-opening documents that Safra provided to BNM to allow BNM bank customers to open custody accounts at Safra. As to these documents, the evidence indicates that the BNM representatives merely acted as scriveners filling out the forms based on information provided by Plaintiffs. Once these documents were filled out, it is undisputed that they were forward to Safra for approval. Assuming, for the sake of argument, that BNM's possession of these documents, gave Plaintiffs reason to believe that BNM had the authority to act as Safra's agent. The scope of that apparent agency would be limited to the opening of custody accounts on Safra's behalf and would not create liability in Safra with respect to Plaintiffs investment in the Promissory Notes. *See Kennedy & Cohen, Inc. v. Allen Appliance Service, Inc.*, 214 So.2d 488, 489 (Fla. 3d DCA 1968) (a principal is not bound by or liable for the acts of its agents that are not within the scope of the agent's actual or apparent authority); *Van Arsdale v. Metropolitan Title Guaranty Co.*, 103 Misc.2d 104, 107, 425 N.Y.S.2d 482 (N.Y.Dist.Ct.1980) (same); *Tymchuk v. City of Rochester*, 43 Misc.2d 98, 105, 250 N.Y.S.2d 202 (1964) (where there is a special agency for a limited purpose, the principal is not bound by acts of the agent outside of that purpose).

There is simply no evidence in the record to indicate that Safra was the principal and BNM the agent with respect to the Plaintiffs' investment in the BNM/NMH Promissory Notes. As previously stated, no one from Safra ever met with spoke to Plaintiffs and Plaintiffs had no prior banking history with Safra. Therefore, there is no way for Safra to have "held out" BNM or its representatives to be agents of Safra with respect to the Promissory Notes. Without an agency relationship with respect Plaintiffs investment in the Promissory Notes, Plaintiffs cannot hold Safra vicariously liable for the alleged misrepresentations of BNM's representatives. Accordingly, summary judgment will be entered as to Count III and IV.

### C. Counts IV and V (Liability Under Florida Securities Laws)

As to Count V and as an alternative reason for summary judgment as to Count IV, Safra points out that, as a condition precedent to liability under the relevant provisions of Florida Statutes, the Promissory Notes must have been sold or offered for sale in Florida. *See* Fla. Stat. §§ 517.301, 517.07, 517.211; *Allen v. Oakbrook Securities Corp.*, 763 So.2d 1099, 1101 (Fla. 4th DCA 1999) (sales or offers for sale occurring outside of Florida are not actionable under § 517.301); *Dokken v. Minnesota–Ohio Oil Corp.*, 232 So.2d 200, 204 (Fla. 2d DCA 1970) (sales or offers for sale are not actionable under 517.07 and 517.211) (applying predecessor statutory provision).

As the evidence in this case does not indicate that Safra sold or offered the Promissory Notes for sale in Florida—or elsewhere for that matter, Safra is also entitled to summary judgment as to these counts.

### CONCLUSION

Based on the foregoing, the Court finds that Safra is entitled to judgment as a

matter of law as to all five counts of Plaintiffs amended complaint. Accordingly, it is

ORDERED AND ADJUDGED that Defendant, Safra National Bank of New York's Motion for Summary Final Judgment [DE # 44] be and the same is hereby GRANTED. This Court will enter final judgment by separate order.